UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| VICTOR M. GONZALEZ-GUZMAN | CIVIL NO. 16- |
| PLAINTIFF | |
| V. | MATTER: |
| METROPOLITAN LIFE INSURANCE CO. D/B/A MET LIFE CORPORATIONS "A", "B" AND "C" JANE DOE; JOHN ROE | BREACH OF CONTRACT BAD FAITH ACTION ADA TITLE III (JURY TRIAL DEMANDED) |
| DEFENDANT | |

COMPLAINT

TO THE HONORABLE COURT:

COMES NOW PLAINTIFF REPRESENTED BY UNDERSIGNING COUNSEL, AND VERY RESPECTFULLY STATES, ALLEGES, AND PRAYS:

JURISDICTION OF THE DISTRICT COURT

1. Jurisdiction of this Honorable Court is proper pursuant to 28 U.S.C. § 1331 (federal question), as this civil action is brought forth *inter alia*, pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. Ch. 126, § 12101, Pub. Law 101-336, *et seq.* 101st Congress 1990, Title III, as amended, and applicable Florida Statute, including Florida 'Bad Faith' Statute, Sec. 624.155, and all other state statutes applicable, pursuant to ancillary or supplemental jurisdiction, pursuant to 28 U.S.C. § 1367.

2. Alternatively or concurrently, federal jurisdiction is proper

pursuant to 28 U.S.C. § 1332(a) (diversity jurisdiction) because plaintiff resides in the Commonwealth of Puerto Rico and defendant is headquartered and a resident of the State of New York. Plaintiff exceeds the threshold amount-in-controversy requirement as the base monetary claim for bad faith claim alone is $221,000.00 owed, and $5,350.00 in monthly hereinafter, plus remedies and relief, under ADA, emotional, excess, consequential, and punitive damages, pre-judgment, and post-judgment interests, costs, expenses, and attorney fees.

3. The denial letter is dated December 8, 2010. The Florida 'bad faith' action, with a 5-year statute of limitations, was tolled at least thrice: (1) by filing a letter to the Florida Department of Financial Services on November 10, 2010 (60 days); (2) mediation on May 23, 2012 (60 days) –both a 120-day extension– and (3) by out-of-state tolling since July 10, 2014. having run 3 years and 7 months, the action is not time-barred. The ADA Title III cause of action has a 4-year deadline for the discriminatory incident on May 23, 2012. Damages continue for disability benefits not received each and every month (Id).

4. Plaintiff, Mr. Victor Gonzalez-Guzman, age 56, is single, a retired comptroller, and resident of San Juan, Puerto Rico. The plaintiff left the State of Florida (out-of-state) on July 10, 2014 to the Dominican Republic and then moved to Puerto Rico.

5. Defendant Metropolitan Life Insurance Company (MetLife) is an

insurance company, based in New York City, State of New York. MetLife issued plaintiff's long-term disability insurance policy number 6463545AH, to the benefit of insured plaintiff.

6. Defendants Companies "A", "B", and "C" are corporate entities that may be found to be liable to the plaintiff for the claims in this complaint, and could be identified as a result of the discovery process.

7. Defendants Jane Doe and John Roe are certain natural persons whose names are yet unknown to the plaintiff, and who may be responsible for the facts and allegations, may be found liable to the plaintiff for the claims in this complaint, and could be identified as a result of the discovery process.

8. Trial by jury pursuant to the Seventh Amendment to the Constitution of the United States of America (1791) is hereby demanded as to all issues of triable facts, including the issues and factual allegations of intimidation, duress, pressure, and coercion.

9. The insured is 100% disabled by the Social Security Administration (SSA) for the same severe fibromyalgia (FM) condition and has been receiving Social Security benefits in excess of $2,500.00 a month for the past 4 years, since 2012. See "Social Security Administration Retirement, Survivors and Disability Insurance Important Information", dated January 13, 2015 (2 pgs) (Attachment 1).

10. Plaintiff is an independent first-party long-term disability insured and filed for coverage on July 20, 2005. He was diagnosed, at age 49, with fibromyalgia (FM) on or about 2009, a condition covered by his disability insurance policy with Metropolitan Life Insurance Company 'MetLife'. See Metropolitan Life Insurance Company "Policy Schedule" for Policy Number 6463454AH, for Victor M. Gonzalez, dated October 1, 2005, (2 pgs.) (Attachment 2).

11. On or about 2009-2010, insured was unable to work as a comptroller due to this debilitating condition.

12. Plaintiff's long-term disability policy provided for disability benefits with monthly payments of $5,350.00, until age 65.(Id.)

13. At the end of 2010, plaintiff claimed his MetLife disability insurance and while he waited for approval sent a letter dated November 10, 2010 to Florida Department of Financial Services "Office of Insurance Regulation" asking the agency to intervene because his waiting period had elapsed in October 2010 and MetLife had not decided the claim. (Attachment 3)

14. The insured was firstly denied coverage on a letter dated December 8, 2010, based on a conclusion that ignored the insured's medical records and fibromyalgia condition and attributed his disability to a temporary vitamin D deficiency.

15. The denial letter did not inform the claimant of his legal rights, including his right to sue or deadlines for filing a

4

civil action in court.

16. On December 21, 2010, the insurer denied the claimant's appeal alleging lack of new evidence.

17. The insured's lawyer at the time Mr. Cesar Gavidia, Esq. did not meet prior with the insured because, according to the insured, Mr. Gavidia told him that he did not need to meet with the insured because: "I am a specialist dealing with MetLife and a meeting is unnecessary because insurance claims against MetLife are a daily routine matter for my firm and I have connections at MetLife."

18. The insured contends that on May 23, 2012, on or about 9:00am, while in a mediation meeting held in a conference, at the offices of Dell & Schafer, the insured was threatened, put under duress, and involuntarily forced and coerced, presumably by agents of Metropolitan Life Insurance Co. to sign a document involuntarily and against his will, under the threat of police arrest and a fabricated criminal prosecution for insurance fraud. The insured asked to see the policy and its terms and was told that the policy was lost and made to sign a document to that effect. The mediator was Mr. Robert Dulberg who was present at the mediation hearing. (Attachment 4)

19. The insured states that he was led by a receptionist to a poorly lit conference room in the Law Offices of Dell & Schaefer. The receptionist told him to go ahead and wait inside

the conference room for his lawyer Mr. Gavidia. Waiting inside the conference room, at the farther end of a conference table, was an unknown lady, presumably an investigator, adjuster, or employee of the insurance company who told the insured, while holding with her left hand the telephone, said: "Are you aware that I could call the FBI right now and accuse you of insurance fraud and put you in jail for five years?" She then, with her right hand, pulled and raised a folder, and told him: "I have in this folder your records over the last 20 years that show that you have been suffering from this chronic condition and your contract based on this folder is totally null."

20. The insured denied that the records pertained to him and that it was a case of mistaken identity because there are other people also named Victor Gonzalez-Guzman, and that his condition began recently. The insured replied that it is impossible that the condition was 20 years ago because a comptroller in his capacity would not be able to hold the responsibilities of such a position with that condition (fibromyalgia) for that many years. The lady told him that anything is possible, that she (MetLife) would issue an advance payment of $100,000.00, and to give her 6 months to investigate further and that if the medical file she suspected was, in fact, not him, MetLife would pay him the rest of his disability benefits. The unknown lady told me to go outside that my lawyer

would be waiting for me to sign the document so that she (MetLife) would issue an advance payment of $100,000.00. I exited the room.

21. According to the insured, his attorney, who the insured later discovered after the meeting was in the office hall outside the conference room at the time of the meeting, was never present at the mediation and did not enter the conference room.

22. The insured's lawyer told the insured to accept the $100,000.00 owed up front and that MetLife will continue to investigate the claim and will decide to make full payment or not based on the results of the investigation in about 6 months.

23. The insured was never given time to read the document on the referred date and he thought that the payment was a partial payment for past due monthly coverage payments, pending further investigation of the claim, and that full payment of his monthly benefits would be made to him, when the investigation concluded in his favor.

24. The document was signed under diminished capacity because the insured was under prescribed medication Oxycodone, Alprazolam, and Zolpidem for Fibromyalgia related pain, insomnia, and anxiety at the time and during the meeting.

25. The policy was apparently 'lost' at the hands of the insurance company, according to a document entitled 'Lost Policy Affidavit'. However, the policy was send to the plaintiff, as

part of the case file the Dell & Schafer law firm recently mailed the insured in the form of a compact disc.

26. The insurer failed to provide a copy of the policy and its terms to the insured plaintiff at the time of the mediation.

27. The document in controversy was not signed by the insurance company or any attorney or representative for MetLife.

28. The document was not signed by two parties, but appears to be signed by one party: the plaintiff and his lawyer. The document appears to be notarized.

29. The document appears initialed in every page only by the plaintiff's attorney, but no page was initialed by plaintiff.

30. Mr. Gonzalez-Guzman felt that if he did not sign the document that the lady and the insurance company would call the police and have him arrested under a fabricated and false charge of insurance fraud and was very afraid to lose his freedom and to be falsely accused by such a powerful company. The insured thought he was signing into receiving an advance in payment.

31. The insured had taken his medication, and was intoxicated, under the influence of Oxycodone, Alprazolam, and Zolpidem, narcotic drugs, as prescribed by his physician at the time of the meeting, when the meeting took place, so the plaintiff insured was not in his right mind and incapable of informed consent or otherwise impaired and unable to provide consent.

32. According to the insured, the meeting and whole incident lasted

8

about 15 minutes.

33. The lawyer and/or mediator never explained to the plaintiff of his rights as an insured or party to a mediation including his right to seek independent legal advice and to be treated as an abused vulnerable adult person due his known fibromyalgia disability, and the overall value of the policy. The settlement agreement, not drafted by plaintiff, contains no language as to the defendant's rights, and to seek independent legal advice, as recognized by Fla. Stat. 44.403(1) et seq. Rules for Certified and Court-appointed Mediators, and ADR Resource Handbook, July 2011, in effect at the time of the incident.

34. Plaintiff has no information of this incident being reported by the mediator pursuant to Fla. Stat. 44.403(1)(Id.).

35. The alleged file waived by the lady 'Jane Doe' containing the 20 year-old medical records of one individual who the lady 'Jane Doe' said was the plaintiff was never disclosed, discovered or produced to the insured. MetLife did not disclose the file with alleged medical records dating back 20 years so that the insured would be in a position to establish a case of mistaken identity, and be duly informed of the evidence supporting the insurer's accusations of fraud and contentions of nullity.

36. MetLife wrongfully denied the plaintiff his long-term disability benefits and the denial was unreasonable and without

proper cause.

37. On July 10, 2014, plaintiff left Florida to the Dominican Republic and has since not returned to Florida. (Attachment 5)

38. The plaintiff filed this second administrative complaint with the Florida Department of Financial Services, Consumer Services Division. The complaint was replied by said department on April 12, 2016. (Attachment 6)

39. The defendant MetLife answered with a letter dated May 3, 2016, indicating that that plaintiff signed a settlement agreement on May 23, 2012, and based upon that assertion, the defendant refuses to discover or furnish any documents, except a copy of said document. (Attachment 7) On May 3, 2016, the undersigning attorney mailed a "Request for Investigation, Notice of Claim, and Intent to File Suit" dated May 2, 2016, to MetLife to their offices in New York and Tampa, Florida with copy to the Florida Department of Financial Services, Division of Consumer Services. The letter contains a "Statement of Facts" signed and initialed by the plaintiff, under penalty of perjury. (Attachment 8) The return receipts dated May 9, 2016 are attached. (Attachment 9)

40. The modest monetary amount set forth in the document does not come close to covering the quality of life for the disability benefits and there were serious defects in the monetary aspects of the document due to the gross underpayment amount when

compared to the actual value of the claim, and the circumstances surrounding the lack of voluntariness due to coercion and intimidation at the hands of MetLife and its agents and to the enormous benefit of the insurance company.

41. Given the facts above, the plaintiff was intentionally mislead and misinformed, and/or the insurance company misrepresented to the plaintiff important issues of medical history and misrepresented the nullity of the policy contract and the threat of criminal arrest and imprisonment, in order to exert mental pressure, under the pretense of insurance fraud, to obtain unfair advantage by intimidating and coercing the plaintiff for the insurer's financial benefit and unjust enrichment. This conduct by the insurer amounts to intentional and extreme bad faith and fraud on the insured in order to avoid and breach the contractual duty to pay the long-term benefits the defendant was entitled to.

42. Such lack of consent due to disinformation, misrepresentation, coercion, intimidation, and duress amounts to bad faith acts, unlawful, and unconscionable conduct by MetLife had the deliberate result of shortchanging and cheating the insured of most of his disability benefits to MetLife's financial advantage to the tune of $221,000 now and to benefit almost $1 million by plaintiff's 65 years of age.

43. The parties did not reach a self-determined agreement, as

required by Florida mediation statute and regulations. This so-called settlement agreement was the product of coercion and threats, duress, and intimidation, upon a vulnerable disabled insured person. The plaintiff is the first-party insured, weaker party to the contracts (insurance policy and settlement agreements), and as such, the non-drafting party to a mass contract, so any doubts or controversies as to the interpretation and elements should be resolved in favor and light favorable to the plaintiff and coverage.

44. The plaintiff states that the law firm Dell & Schaefer and the mediator, both professionals, collected around $42,000.00 for the unfair deal, leaving the plaintiff with around $58,000.00 in total, a meager amount indeed to manage his severe fibromyalgia and provide for his sustenance and living needs for the rest of his life, when compared to the $1,027,200.00 he would be receiving had the insurance company acted in good faith.

45. In light of the facts above, we pray the settlement agreement document be rescinded, vacated and/or set aside, declared and rendered null, void, and without legal effect, or otherwise unenforceable, because the plaintiff primary insured was forced, bullied, intimidated, coerced, and/or threatened, into signing the document and/or the plaintiff lacked consent capacity because of his medicated state at the time of the

meeting to engage in informed consent decisions and/or the plaintiff was discriminated against by MetLife on the basis of his severe fibromyalgia disability, all of which negate consent or volition by the disabled insured.

46. In the alternative, the document is both procedurally and substantively unconscionable and/or unenforceable and a matter of fact and law.

47. The insured has reason to believe that this course of conduct on behalf of MetLife, and its agents, is a pattern or scheme of conduct aimed at depriving the insured of their due compensation and rights, by unreasonably denying a rightful claim and then using, threats, coercion, and intimidation to force a settlement agreement for less that 10% of the value of the benefits, as a means of underpaying their beneficiaries.

48. The defendant is liable for breach of contract (denial of long-term disability benefits unreasonably and without roper cause).

49. The defendant breached the implied covenant of good faith and fair dealing.

50. The defendant's negligence also arises from the unreasonable denial of the claim based on vitamin D deficiency when the defendant knew that the plaintiff had fibromyalgia; a breach of policy.

51. The defendant discriminated against the plaintiff based on his fibromyalgia first by denying benefits having knowledge of his

13

disability and second by taking advantage of his fibromyalgia disability by inflicting mental pressure and severe anxiety and mental and emotional distress to obtain unfair financial advantage, in violation of the bad faith statute and the ADA.

52. As to the law and authority, it is a long-setted precept of insurance law, that a policy is to be contrued liberally in favor of coverage. We examine the applicable body of law:

53. The first, second, and third causes of action arise under Florida general contract law, bad faith 624.155, and insurance unfair practices 626.9541 statutes.

Florida 'Bad Faith' statute, provides, in part, that "[a]ny person may bring a civil action against an insurer when such person is damaged [by an insurer] not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests . . .". Fla. Stat. §624.155(1)(b)1. *See also, Speedway Superamerica, LLC v. Tropic Enter., Inc.,* 966 So. 2d 1, 3 (Fla. 2d D.C.A. 2007) (recognizing that an implied covenant of good faith exists in virtually all contractual relationships); *White v. Syfrett,* 955 So. 2d 1110, 1114 (Fla. 1st D.C.A. 2006) (noting that every contract requires the parties perform in good faith).

In Florida general contracts case law, the implied covenant and duty of good faith and fair dealing is recognized in the context of settlement agreements. See *Barnier v. Rainey*, 890 So. 2d 357, 359 (Fla. 1st D.C.A. 2004) (insurance policies are governed by contract law); *See, e.g., A-1 Duran Roofing, Inc. v. C.M.R. Properties, Inc.,* 903 So. 2d 299, (Fla. 3d D.C.A. 2005) (meeting of the minds is required to enforce a settlement agreement); *Cheverie v. Geisser,* 783 So. 2d 1115, 1118 (Fla. 4th D.C.A. 2001) (same). See *N. Am Van Lines, Inc. v. Lexinton Ins. Co. 678 So. 2d 1325, 1331* (Fla. 4th D.C.A. 1996 (quoting Diamond Heughts Homeowners *Ass'n. v. Natl'l. Am. Ins. Co.*, 277 Cal. App. 3d 563 (1991)). *Shin Crest PTE, Ltd. v. AIU Ins. Co.*, 605 F. Supp.2d 1234 (M.D. Fla. 2009) (noting that the purpose

14

of bad faith statute is to deter improper handling of claims); *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 682-83 (Fla. 2005)(noting that the purpose of bad faith is to "protect insureds … who have fulfilled their contractual obligations by cooperating fully with the insurer in the resolution of claims"). *Talat Enters., Inc. v. Aetna Cas. and Sur. Co.*, 753 So. 2d 1278, 1282 (Fla. 2000) (indicating that one purpose of Fla. Stat. §624.155 is to encourage payment of claims and avoid bad faith litigation); *See GEICO Gen. Ins. Co. v. McDonald*, 315 F. Appx. 181, 184 (11th Cir. 2008) (citing *Berges* for the proposition that bad faith claims focus on insurer's conduct and affirming jury verdict finding bad faith); *Gutierrez v. Yochim*, 23 So. 3d 1221 (Fla. 2d D.C.A. 2009) (citing *Berges* for the proposition that "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligation to the insured," and reversing grant of summary judgment in favor of insurer); *Lee v. Progressive Exp. Ins. Co.*, 909 So. 2d 475 (Fla. 4th D.C.A. 2005) (citing *Berges* for the same proposition and denying insurer discovery request for documents reflecting communications that could have shown evidence of bad faith set-up by plaintiff).

In Vitalis-Valchine, 793 So.2d 1094 (Fla. 4th DCA 2001), misconduct by a mediator in violation of the Florida Rules for Certified and Court Apointed Mediators can provide a basis for setting aside a mediated settlement agreement. "Since our system of justice depends on truthful discovery, misconduct in discovery must be discouraged by disallowing the settlement which is the fruit of such misconduct". Garvin v. Tidwell, 37 Fla. Law Weekly D2056A (Fla. 4th DCA Oct. 24, 2012).

Florida law clearly prohibits the wrongful practices and conduct of the insurer, as detailed above in this complaint:

"626.9541 Unfair methods of competition and unfair or deceptive acts or practices defined.—(1) UNFAIR METHODS OF COMPETITION AND UNFAIR OR DECEPTIVE ACTS.—The following are defined as unfair methods of competition and unfair or deceptive acts or practices:[…](g)Unfair discrimination.—1. Knowingly making or permitting unfair discrimination between individuals of the same actuarially supportable class and equal expectation of life, in the rates charged for a life insurance or annuity contract, in the dividends or other benefits payable thereon, or in any other term or condition of such contract. 2. Knowingly making or permitting unfair discrimination between

individuals of the same actuarially supportable class, as determined at the time of initial issuance of the coverage, and essentially the same hazard, in the amount of premium, policy fees, or rates charged for a policy or contract of accident, disability, or health insurance, in the benefits payable thereunder, in the terms or conditions of such contract, or in any other manner.(i) Unfair claim settlement practices.— 1. Attempting to settle claims on the basis of an application, when serving as a binder or intended to become a part of the policy, or any other material document which was altered without notice to, or knowledge or consent of, the insured; 2. A material misrepresentation made to an insured or any other person having an interest in the proceeds payable under such contract or policy, for the purpose and with the intent of effecting settlement of such claims, loss, or damage under such contract or policy on less favorable terms than those provided in, and contemplated by, such contract or policy; or 3. Committing or performing with such frequency as to indicate a general business practice any of the following: a. Failing to adopt and implement standards for the proper investigation of claims; b. Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; d. Denying claims without conducting reasonable investigations based upon available information; […] (l) Twisting.—Knowingly making any misleading representations or incomplete or fraudulent comparisons or fraudulent material omissions of or with respect to any insurance policies or insurers for the purpose of inducing, or tending to induce, any person to lapse, forfeit, surrender, terminate, retain, pledge, assign, borrow on, or convert any insurance policy or to take out a policy of insurance in another insurer.

In *Wietzenkamp v. Unum Life Ins. Co. of Am.*, 661 F3d 323 (7th Cir. 2011) the district court found that fibromyalgia is not a self-reporting condition when diagnosed with the, but one that could be verified by "more or less objective" means of observation and visible manifestations: "We have recognized that the trigger test can "more or less objectively" establish the disease where the findings of the test are consistent with fibromyalgia. Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 919 (7th Cir. 2003). Chronister v. Baptist Health, 442 F.3d 648, 656 (8th Cir. 2006), held that the claimant's fibromyalgia was not within the self-reported symptoms limitation in light of that court's having already accepted that the trigger test "qualifies as a clinical examination standardly accepted in the practice of medicine." Significantly, even Unum does not dispute that the diagnosis is

objectively verifiable. Because the disabling illness in this case, fibromyalgia, is not primarily based on self-reported symptoms, but rather can be based on the verifiable evidence of its manifestations, the self-reported symptoms limitation does not apply in this case. . . ." But see, *Brien v. Metropolitan Life Ins. Co.*, 2012 U.S. Dist. Lexis 135790 (Sept 21, 2012.) where the so-called 'neuromusculoskeletal and soft tissue exclusion' was upheld and to MetLife's denial of benefits.

54. MetLife has a history of systematic and unreasonable denials, based on insurmountable requirements, when claims are based on fibromyalgia:

"MetLife's justification for denying Plaintiff's claim was the lack of objective medical evidence to support the conclusion that Plaintiff was disabled. But fibromyalgia "is diagnosed entirely on the basis of patients' reports of pain and other symptoms," and "there are no laboratory tests to confirm the diagnosis." *Benecke v. Barnhart,* 379 F.3d 587, 590 (9th Cir.2004). Dr. Hill informed MetLife of this fact, and Dr. Payne did not dispute it. Nonetheless, MetLife completely discounted the history of Plaintiff's condition, Plaintiff's subjective reports of pain and Dr. Hill's evaluation of Plaintiff's functional capacity. Instead, it relied exclusively on Dr. Payne's report, even though Dr. Payne had not examined Plaintiff or performed a functional capacity test on him, but instead rendered his opinion based on a lack of evidence that one would not expect to find in the first place. While MetLife need not "accord special weight to the opinions of a claimant's physician," MetLife nonetheless may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003). There is nothing in the record to suggest that Dr. Hill's opinion was flawed, and MetLife's failure to credit it was arbitrary under the circumstances. Moreover, the reasoning in Dr. Payne's January 24, 2008 report reflects a belief that pain that is not supported by objective findings can never be so severe as to interfere with one's ability to function in the workplace. <u>MetLife's embrace of such a view is disapproved by the Ninth Circuit</u>. The appeals court has noted that "individual reactions to pain are subjective and not easily determined by reference to objective measurements." *Saffon,* 522 F.3d at 872. In *Fair v. Bowen,* 885 F.2d 597 (9th Cir. 1989), the court stated: [D]espite our inability to measure and describe it,

pain can have real and severe debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from working. Because pain is a subjective phenomenon, moreover, it is possible to suffer disabling pain even where the degree of pain, as opposed to the mere existence of pain, is unsupported by objective medical findings. *Id.* at 601.[3] By "effectively requiring `objective' evidence for a disease that eludes such measurement," *Benecke,* 379 F.3d at 594, MetLife has established a threshold that can never be met by claimants who suffer from fibromyalgia or similar syndromes, no matter how disabling the pain. The Court concludes that, considering all of the circumstances of this case and evidence in the record, it was an abuse of discretion for MetLife to deny Plaintiff's claim on the sole basis that there was no objective evidence of his limitations, thereby discounting all other evidence in the record and imposing a requirement that Plaintiff could not possibly satisfy." *Minton v. Deloitte & Touche USA LLC Plan*, 631 F.Supp.2d 1213 (N.D. Cal. 2009) (Emphasis added).

55. Fourth cause of action: is for disability benefits discrimination in the form of unfair discriminatory and settlement practices, wrongful denial of benefits and duress and intimidation against a disability insured, under ADA, Title III:

56. The ADA, Title III, prohibits discrimination on the basis of a disability. The categorical denial of long-term disability (LTD) benefits is a violation of ADA. The violation in this case is based on disability covered by the policy and by the ADA statute.

Disability-based insurance decisions have often cut off access to health care after two years for people disabled by mental illnesses, while benefits for physical illness would have continued until the insured reached age sixty-five. See Erwin v. Northwestern Mut. Life Ins. Co., 999 F. Supp 1227, 1228 (S.D. Ind. 1998).

The Supreme Court decided that the definition of a person

with a disability as one who has an impairment that "substantially limits one or more of the major life activities," or who has a record of such an impairment or is regarded as having such an impairment, 42 U.S.C. § 12102(2) (1994) should be read as including only those people who are substantially limited even while employing mitigating measures. See *Sutton v. United Air Lines*, 119 S. Ct. 2139, 2146 (1999); *Murphy v. United Parcel Serv.*, 119 S. Ct. 2133 (1999). Those holding for disabled policy holders have found that the provision shields only traditional statistics-based practices, so that disability-based decisions not tied to actuarial data are subject to regulation under the ADA.

The ADA describes itself in its caption as "[a]n Act [t]o establish a clear and comprehensive prohibition of discrimination on the basis of disability." This promise of broad regulation is then carried out in the Act's substantive titles: Title III in "public accommodations and services operated by private entities.' Pub. L. No. 101-336, 104 Stat. 327 (1990) 42 U.S.C. § 12181-12189. Because its approach is thus so sweeping and holistic, the ADA was hailed after its passage in 1990 as "the most innovative and far-reaching federal civil rights legislation-ever--on behalf of disabled persons'" and as "a historic landmark in the civil rights movement."

In Section 302(a), the general antidiscrimination provision of Title III, provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation." Plaintiffs who have purchased insurance directly from insurance companies," as well as plaintiffs who receive insurance through their jobs," have sued insurance companies under this provision. Section 302(b)(2)(A) defines "discrimination" as used in section 302(a) to include: the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered .... 42 U.S.C. § 12182(b)(2)(A)(i). See Carparts Distrib. Ctr., Inc. v. Automotive Wholesaler's Ass'n, 37 F.3d 12, 19 (1st Cir. 1994).

"Congress clearly contemplated that 'service establishments' include providers of services which do not require a person to physically enter an actual physical structure," since travel services conduct much of their business by telephone and mailY The same argument applies to several other listed entities, including "other sales or rental establishment," "bank," "office of an accountant or lawyer," "insurance office," and "other service establishment. (Id.)

57. Plaintiff's fribromyalgia, is recognized as a severe disability when the Social Security Administration found that plaintiff's fibromyalgia condition rendered the beneficiary unable to do any substantial gainful activity and the condition interferes with basic work-related activities.

58. The denial of the benefits while knowing of the severe fibromyalgia condition or the disability was a basis for discrimination by MetLife from the outset of the claim process.

59. The defendant knew that the condition was covered under the policy terms. The defendant denied coverage and LTD benefits ignoring his disabling condition thereby discriminating against the plaintiff due to his severe fibromyalgia condition.

60. The defendant knew that the plaintiff's diagnosed condition warranted the LTD benefits but used a subterfuge to deny the claim, and when faced with litigation, at the mediation hearing used scare tactics, threats, intimidation, coercion, and duress to avoid having to pay the benefits entitled plaintiff under the terms of the LTD policy.

61. Then, with knowledge of this debilitating physical impairment

condition proceeded to intimidate, coerce, threaten, and force plaintiff into signing a document taking advantage of his disability, frail health, and condition in order to, by threats, intimidation, coercion and/or duress, force a settlement upon a sick, incapacitated, and disabled person, all in bad faith and in violation of ADA, Title III, because the insured knew that the plaintiff had a severe painful condition and threatened and abused the insured with the intention and purpose of pressuring a deal unfairly advantageous to the insurance company.

62. MetLife acted in bad faith by employing coercion and intimidation in order to force the document of a disability benefits claims for less than ten percent of the actual value of such claim. The insurer engaged in scare and bully tactics to obtain an involuntary and forced signature. MetLife breached the implied contractual duty of good faith and fair dealing that requires it to carry out the policy terms for the benefit of the other party to the contract, the insured.

63. The estimated value of the LTD disability denial, bad faith claim, should the insured reach age 65, which is likely to occur, due to the insured's life expectancy charts expectancy age of 74, ($5,350.00 x 16 yrs. (192 months) = $1,027,200) is over $1 million.

64. The value owed today (May 2016) of the policy, had it been paid

is estimated since 2010 at ($5,350 x 60 months) is estimated at $321,000, minus the $100,000 partial payment, a total of $221,000, and $5,350.00 monthly thereinafter, until age 65.

65. The insured seeks declaratory relief for the nullity and invalidity of the document, for his coverage, and bad faith, compensatory relief for breach of contract, and for breach of the implied and statutory covenants of good faith and fair dealings, damages for losses, emotional damages, intentional infliction of emotional distress, excess, and punitive damages, interests, attorney fees, costs, and expenses.

66. The claimant seeks pre- and post-judgment interests for all monthly benefits unpaid, costs, expenses, and attorney fees.

67. Punitive damages are sought in an amount no less than $5 million for the coercion and intimidation and similar pattern of systematic and systemic denial of LTD benefits to disability-related fibromyalgia beneficiaries, using coercive, intimidating, and threatening or other unlawful practices and tactics used by the insurer in a widespread and systematic manner in order to avoid paying benefits for fibromyalgia-based LTD disability claims.

68. The above described course of conduct violates Florida general contract and bad faith statutes, regulations and ADA, and is not in favor of coverage.

69. Given the above, the settlement agreement should be rescinded,

voided or nullified for lack of valid consent, duress and/or discrimination or, in the alternative, it should be reformed. The defendant should be found in liable for breach of contract, bad faith, and damages, and ordered specific performance of the policy, by instating or reinstating the LTD benefits (until age 65) and to pay all unpaid monthly benefits retroactively, minus the $100,000.00 already paid.

WEREFORE the plaintiff respectfully request that his complaint be granted in all its parts, that declaratory relief be granted declaring the settlement agreement rescinded, set aside and/or vacated, for intimidation, coercion and duress, diminished capacity, disability discrimination, and/or unlawful conduct incurred by the defendant, and that the plaintiff be awarded $221,000.00 in retroactive unpaid long-term disability benefits, and that the disability benefits be reinstated, for $5,350.00 monthly payments, until age 65, and that the plaintiff be awarded, emotional, excess, and consequential damages for $1 million, and punitive damages for an amount no less than $5 million, expenses, costs, pre and post-judgment interests, and attorney fees, both statutory and for bad faith.

RESPECTFULLY SUBMITTED. In San Juan, Puerto Rico, on May 22, 2016.

/s/ Hector L. Barreto-Cintron
Hector L. Barreto-Cintron, Esq.
USDC-PR Bar No. 220808
PO Box 21476, San Juan, P.R. 00931
T./F. (787) 539-9000; hectorbarretolaw@gmail.com

23